**PUBLIC VERSION**

**FINAL REMAND REDETERMINATION**
***Fedmet Resources Corporation v. United States***
Court No. 21-00248 (Ct. Int'l Trade)
EAPA Case No. 7412
September 1, 2023

## I.    SUMMARY

U.S. Customs and Border Protection (CBP) has prepared this remand redetermination pursuant to the Remand Order issued by the U.S. Court of International Trade in *Fedmet Resources Corp. v. United States*, No. 21-00248 (Ct. Int'l Trade Jan. 6, 2022), ECF No. 38 (hereinafter, Remand Order).  This remand concerns CBP's determination that Fedmet Resources Corporation (Fedmet) evaded[1] the Antidumping (AD) and Countervailing Duty (CVD) orders on certain magnesia carbon bricks (MCB) from the People's Republic of China (China) (hereinafter, Orders).[2]  CBP sought a voluntary remand to consider several issues raised in Fedmet's motion for judgment on the administrative record.[3]  The Court granted CBP's motion, and remanded CBP's December 3 Determination and the Admin. Review for further consideration.[4]

As explained further below, CBP determines on remand that Fedmet entered covered merchandise into the customs territory of the United States through evasion.  As part of this

---

[1] Notice of Final Determination as to Evasion, EAPA Case No. 7412, December 3, 2020, Confidential Record Document (C.R.) 103, Public Record Document (P.R.) 103 (hereinafter, December 3 Determination); Final Administrative Review Determination, EAPA Case No. 7412, April 13, 2021, P.R. 115 (hereinafter, Admin. Review).

[2] Certain Magnesia Carbon Bricks from Mexico and the People's Republic of China: Antidumping Duty Orders, 75 Fed. Reg. 57257 (Sept. 20, 2010); Certain Magnesia Carbon Bricks from the People's Republic of China: Countervailing Duty Order, 75 Fed. Reg. 57442 (Sept. 21, 2010) (hereinafter, AD/CVD Order).

[3] *See* Defendant's Motion for Voluntary Remand and To Suspend the Current Briefing Schedule, *Fedmet Resources Corp. v. United States*, No. 21-00248 (Ct. Int'l Trade Jan. 6, 2022), ECF No. 37 (hereinafter, Government's Motion for Voluntary Remand).

[4] Order on Defendant's Motion for Voluntary Remand, *Fedmet Resources Corp. v. United States*, No. 21-00248 (Ct. Int'l Trade Jan. 6, 2022), ECF No. 38 (hereinafter, Remand Order).

PUBLIC VERSION

proceeding on remand, CBP has reconsidered and supplemented the administrative record.[5]

Further, in compliance with 19 C.F.R. § 165.4, CBP placed revised public versions of business

confidential documents on the administrative record and, after requiring the interested parties to

do the same, provided the parties to the investigation an opportunity to submit rebuttal

information and written arguments.  CBP also released certain previously withheld business

confidential information to Fedmet that the agency determined belonged to Fedmet.

On August 11, 2023, CBP issued a draft version of this remand redetermination to the

parties to the investigation.[6]  On August 21, 2023, Fedmet and the Alleger, Magnesia Carbon

Brick Fair Trade Committee (MCBFTC or the Alleger) submitted written comments to the draft

remand redetermination.[7]  We address the parties' arguments below.

## II.    BACKGROUND

On December 3, 2020, CBP issued an affirmative determination of evasion finding that

Fedmet's imports of refractory bricks were entered into the United States through evasion.[8]

Specifically, CBP found that Fedmet imported MCBs subject to the Orders and, at the time of

entry, represented to CBP that the imported merchandise was a product of different chemical

composition that was not subject to the Orders.[9]  On administrative review, CBP's Regulations

and Rulings Directorate affirmed the December 3 Determination, finding that the chemical

---

[5] *See* Letter from Brian M. Hoxie to The Honorable Lisa Wang, Re: Covered Merchandise Referral Request for EAPA Investigation 7412 (Remand Number 7703), Imported by Fedmet Resources Corporation, LLC: Antidumping and Countervailing Duty Orders on Certain Magnesia Carbon Brick from the People's Republic of China (June 30, 2022) (hereinafter, Covered Merchandise Referral).

[6] *See* Email from Kareen Campbell to Counsel for Fedmet Resources Corporation and Counsel for Magnesia Carbon Bricks Fair Trade Committee Re: Fedmet – 7412 Remand – Draft Remand Redetermination (Aug. 11, 2023; 5:31 PM EDT).

[7] Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Victoria Cho, Re: Investigation Of Fedmet Resources Corporation: Submission Of Comments (August 21, 2023) (hereinafter, MCBFTC Comments on Draft Remand); Letter From Counsel for Fedmet Resources Corporation to Victoria Cho, Re: EAPA Case No. 7703: Comments on Draft Remand Redetermination and CH20200430 Re-Test (August 21, 2023) (hereinafter, Fedmet Comments on Draft Remand).

[8] December 3 Determination.

[9] *Id*.

composition of the majority of Fedmet's imported bricks placed such bricks within the scope of

the Orders.[10]  CBP incorporates by reference the factual background outlined in the December 3

Determination and the Admin. Review.[11]

Fedmet challenged CBP's December 3 Determination and Admin. Review at the U.S.

Court of International Trade.[12]  Fedmet presented three primary arguments.  First, Fedmet argued

that CBP's investigation procedures deprived it of its due process rights as a result of CBP's

failure to provide the evidence upon which CBP based its determination of evasion.  Second,

Fedmet argued that CBP exceeded its statutory authority by redefining the scope of the Orders

on MCBs from China.  Finally, Fedmet contended that CBP's determination of evasion was

arbitrary and capricious and unsupported by record evidence.[13]

Following Fedmet's opening brief, CBP sought voluntary remand to consider Fedmet's

scope-related arguments[14] and its due process arguments to the extent these arguments could be

addressed by the remand.[15]  The motion indicated that a remand would allow CBP to further

review the administrative record and provide public versions and public summaries, as

appropriate, of certain business confidential documents discussed in Fedmet's motion for

judgment on the administrative record, as well as provide Fedmet with an opportunity to submit

rebuttal information and written arguments relevant to the remand record.[16]

---

[10] Admin. Review.

[11] December 3 Determination at 2-3; Admin. Review at 2-3.

[12] *See* Complaint, *Fedmet Resources Corp. v. United States*, Court No. 21-00248 (Ct. Int'l Trade May 21, 2021), ECF No. 6.

[13] Brief of Fedmet Resources Corporation in Support of its Motion for Judgment on the Administrative Record, *Fedmet Resources Corp. v. United States*, No. 21-00248 (Ct. Int'l Trade Nov. 18, 2021), ECF No. 31, at 2-3 (hereinafter, Pl. MJAR).

[14] Defendant's Motion for Voluntary Remand at 3 (citing Pl. MJAR at 41-64).

[15] *Id*.

[16] *Id*. (citing Pl. MJAR at 31-40).

III.    REMAND PROCEDURE

On January 14, 2022, CBP issued a letter to the parties to the investigation requiring

submission of revised public versions of confidential documents no later than 5:00 p.m. Eastern

on January 24, 2022.[17]  CBP requested that revised public versions contain public summaries of

the business confidential information with sufficient detail to allow for reasonable understanding

of the redacted information or, if summaries could not be provided, an explanation as to why the

information was not susceptible to public summarization.[18]  Further, CBP advised that on or

before January 28, 2022, in compliance with 19 C.F.R. § 165.4(e), CBP would provide the

parties with revised public versions of documents that it previously placed on the administrative

record.[19]  On the same day, CBP issued similar letters to the end users and manufacturers from

whom CBP obtained information during the investigation, however these entities did not submit

the requested documents.[20]

On January 24, 2022, MCBFTC submitted a revised public version of its allegation

providing public summaries of bracketed business confidential information.[21]  On January 31,

2022, Fedmet submitted revised public versions of documents it filed with CBP during the

investigation.[22]  On February 2, 2022, CBP provided Fedmet with business confidential versions

of CBP laboratory reports prepared by CBP that had been redacted by the agency during the

---

[17] *See* Letter from Brian M. Hoxie to Counsel for the Parties for Public Versions and Public Summaries (Jan. 14, 2022), at 1 (hereinafter, TRLED Letters to Parties for Public Summaries).
[18] *Id*.
[19] *Id*. at 2.
[20] *See* Letter from Brian M. Hoxie to Counsel for Manufacturer 1 for Public Versions and Public Summaries (Jan. 14, 2022); Letter from Brian M. Hoxie to Counsel for Manufacturer 2 for Public Versions and Public Summaries (Jan. 14, 2022); Letter from Brian M. Hoxie to Counsel for Manufacturer 3 for Public Versions and Public Summaries (Jan. 14, 2022); Letter from Brian M. Hoxie to Representatives for End User 1 for Public Versions and Public Summaries (Jan. 14, 2022);  Letter from Brian M. Hoxie to Representatives for End User 2 for Public Versions and Public Summaries (Jan. 14, 2022).
[21] *See* Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Brian M. Hoxie, Re: Investigation of Fedmet Resources Corporation: Response to Request for Revised Public Summarization (Jan. 24, 2022).
[22] *See* Letter from Counsel for Fedmet Resources Corporation to Brian M. Hoxie, Re: EAPA Case No. 7412: Voluntary Submission of Supplemental Information (Jan. 31, 2022).

original investigation and requested that Fedmet provide public summaries of its business confidential information.[23]  On February 4, 2022, Fedmet submitted the requested public versions of the laboratory reports.[24]  More specifically, Fedmet submitted public versions of C.R. 27, 90, 99, and 102.[25]  CBP required that the parties submit any rebuttal factual information by February 9, 2022.[26]

On February 7, 2022, the Alleger requested that CBP reject Fedmet's February 4, 2022 submission arguing that it was inappropriate for Fedmet to place confidential documents generated by CBP on the administrative record of this proceeding.[27]  The alleger further argued that Fedmet impermissibly withheld the results of the laboratory analysis, i.e., the composition of the MCBs from the public version of the documents.[28]  On February 10, 2022, Fedmet requested that CBP disclose the email correspondence entitled "LSS Additional Lab Results Re_Fedmet Brick Samples (7412) PV" found at C.R. 30 and P.R. 35.[29]  Fedmet also requested the fulsome testing methodology surrounding C.R. 27, 90, 99, and 102.[30]  On February 17, 2022, CBP placed a revised public version of C.R. 30 on the record, containing previously redacted CBP laboratory's calculations of aluminum oxide contents in Fedmet's MCBs.[31]  At that time, CBP

---

[23] *See* Email from Kareen Campbell to Counsel for Fedmet Resources Corporation Re: Lab Reports for Remand 7412 for Public Summarization (Feb. 2, 2022; 4:46 PM EST).

[24] *See* Letter from Counsel for Fedmet Resources Corporation to Brian M. Hoxie, Re: EAPA Case No. 7703: CBP Laboratory Reports Public Versions (Feb. 4, 2022).

[25] *Id.*

[26] *See* Emails from Tina Marie Whiteside to Counsel for Fedmet Resources Corporation and Magnesia Carbon Bricks Fair Trade Committee, RE: Submission of the Public Summaries for the Remand EAPA 7412 (Feb. 2, 2022; six emails between 4:15 PM and 4:21 PM EST).

[27] *See* Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Brian M. Hoxie, Re: Investigation of Fedmet Resources Corporation: Request for Rejection (Feb. 7, 2022).

[28] *Id.*

[29] *See* Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Brian M. Hoxie, Re: EAPA Case No. 7703: Request for Additional Disclosures (Feb. 10, 2022).

[30] *Id.*

[31] Email from Kareen Campbell to Counsel for Fedmet Resources Corporation and Counsel for Magnesia Carbon Bricks Fair Trade Committee, Re: EAPA Case 7703 – Fedmet 2nd Ext Req RE Responsive FI & Arg (Feb. 17, 2022; 5:37 PM EST).

denied Fedmet's request for the additional fulsome laboratory methodology.[32]  On February 18,

2022, the Alleger requested that CBP make public all results of laboratory testing, and

specifically, the chemical composition of MCBs identified by CBP testing.[33]  CBP denied the

Alleger's request on February 24, 2022, distinguishing C.R. 30, an email chain between the CBP

Center of Excellence and Expertise and CBP Laboratory Scientific Services (LSS), from the

testing results contained in C.R. 27, 90, 99, and 102.[34]  CBP stated that C.R. 30 contains

"approximate estimates aluminum and aluminum oxide thought to have been contained in

Fedmet's products whereas the lab reports reveal business proprietary information, in the form of

precise percentages of these substances, that Fedmet opted not to make public."[35]

On February 25, 2022, Fedmet and the Alleger filed their respective rebuttal factual

submissions.  Fedmet's submission contained declarations challenging the laboratory testing

methodology used by CBP and information regarding standard testing methodologies for testing

chemical composition of MCBs.[36]  The Alleger's submission further contained documents

submitted to Commerce in *S&S Refractories Scope Proceeding* and focused on the differences

between various laboratory testing methods used in distinguishing in-scope MCBs from out of

scope magnesia-alumina carbon bricks (MAC Bricks).[37]  On March 7, 2022, the parties to this

remand proceeding submitted written arguments.[38]

---

[32] *Id*.
[33] *See* Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Brian M. Hoxie, Re: Investigation of Fedmet Resources Corporation: Request for Additional Public Summaries (Feb. 18, 2022).
[34] *See* Email from Kareen Campbell to Counsel for Fedmet Resources Corporation and Counsel for Magnesia Carbon Bricks Fair Trade Committee, Re: EAPA Case No. 7703 - Fedmet Resource Corporation v. United States, Court No. 21-000248 (Feb. 24, 2022; 10:40 AM EST).
[35] *Id*.
[36] Letter from Counsel for Fedmet Resources Corporation to Brian M. Hoxie, Re: EAPA Case No. 7703: Submission of Rebuttal Factual Information (Feb. 25, 2022).
[37] *Id*.
[38] *See* Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Brian M. Hoxie, Re: Investigation Of Fedmet Resources Corporation: Submission Of Comments Regarding Public Summaries And New Factual Information (Mar. 7, 2022); *see also* Letter from Counsel for Fedmet Resources Corporation, Re:  EAPA Case No. 7703: Submission of Written Comments (Mar. 7, 2022) (hereinafter, Fedmet March 2022 Written Comments).

After reviewing the additional information on the record related to the appropriateness of various testing methodologies for refractory bricks, as well as the written arguments submitted by the parties, CBP could not determine whether MCBs imported by Fedmet were subject to the Orders.  On June 30, 2022, CBP submitted a covered merchandise referral to Commerce, requesting that Commerce determine whether the product imported by Fedmet and tested by CBP was subject to the Orders.[39]  Specifically, CBP requested that Commerce determine whether 11 brick samples taken from merchandise imported by Fedmet and tested in the four laboratory reports constituted subject MCBs or non-subject MAC Bricks.[40]  The referral to Commerce included the full laboratory methodology employed by LSS when conducting the tests on Fedmet's sample bricks which was also made available to the parties to the investigation.[41]

On May 3, 2023, Commerce transmitted its Final Determination on the Covered Merchandise Inquiry to CBP (hereinafter, Covered Merchandise Decision).[42]  In its determination, Commerce found that two of the 11 brick samples did not reflect the chemical composition of non-subject MAC bricks and were covered by the Orders.[43]  Commerce found that it could not determine whether the remaining nine samples' chemical composition reflected a subject or non-subject brick.[44]  Based on the issues identified by Commerce in the Covered Merchandise Decision, and in particular with respect to the proper methodology for testing the

---

[39] *See generally* U.S. Customs and Border Prot., Covered Merchandise Referral Request for EAPA Investigation 7412 (Remand Number 7703), June 30, 2022 (hereinafter, Covered Merchandise Referral).

[40] *Id*. at 3.

[41] *Id*. at Attachments 1-4.

[42] Letter from Michael Walsh to Eric Choy, Re: Covered Merchandise Referral Regarding EAPA Investigation No. 7412 (May 3, 2023) (hereinafter, May 3 Letter).

[43] U.S. Dep't of Commerce, Decision Memorandum for the Final Determination of Covered Merchandise Inquiry – EAPA Inv. 7412: Certain Magnesia Carbon Bricks from the People's Republic of China (Apr. 27, 2023), at 3, 10 (Covered Merchandise Decision).

[44] *Id*.  at 10.

content of Aluminum Oxide (Alumina) in Fedmet's imported merchandise, CBP determined that

additional testing of the nine remaining brick samples was required.[45]  Between May 23, 2023

and July 31, 2023, CBP retested the brick samples previously tested in Lab Report Nos.

CH20201030,[46] CH20201071,[47] and CH20200430.[48]  On June 30, 2023, CBP placed certain new

laboratory test result reports generated after the retest on the record.[49]  Specifically, CBP placed

new tests results for the brick samples previously tested in Lab Report Nos. CH20201030 and

CH20201071.[50]  CBP placed the test results for the brick samples previously tested in Lab

Report No. CH20200430 on the remand record at the same time it placed a draft version of this

remand redetermination on the record, and as such, any comments from the Parties relevant to

the retest for Lab Report No. CH20200430 are incorporated in this final remand

---

[45] CBP did not retest two samples previously tested in Lab Report. No. SF20200826, because Commerce found that the test adequately identified the chemical composition of the Fedmet's bricks.

[46] *See* U.S. Customs & Border Prot., Laboratory and Scientific Services, Laboratory Report No. CH20201030 (July 21, 2020), C.R. 102.

[47] *See* U.S. Customs & Border Prot., Laboratory and Scientific Services, Laboratory Report No. CH20201071 (July 21, 2020), C.R. 90.

[48] *See* U.S. Customs & Border Prot., Laboratory and Scientific Services, Laboratory Report No. CH20200430 (Apr. 9, 2020), C.R. 27.

[49] *See* Email from Kareen Campbell to Counsel for Fedmet Resources Corporation and Counsel for Magnesia Carbon Bricks Fair Trade Committee transmitting "business confidential versions of sampling" (June 30, 2023; 2:16 PM EDT).  *See also* Memorandum to the File, Subject: EAPA Investigation 7412 Remand: Additional CBP Lab Test Results and Information (June 30, 2023) (adding to the record Laboratory Report No. NY20230687A (retest of CH20201071) reported on June 27, 2023 (hereinafter, 1071 Retest)) and Memorandum to the File, Subject: EAPA Investigation 7412 Remand: Additional CBP Lab Test Results and Information (June 30, 2023) (adding to the record Laboratory Report No. NY20230688A (retest of CH20201030) reported on June 27, 2023 (hereinafter, 1030 Retest)).

[50] See 1071 Retest and 1030 Retest.

redetermination.[51]  On July 17, 2023, MCBFTC and Fedmet submitted comments regarding the

laboratory testing results in the 1030 Retest and 1071 Retest.[52]

## IV.    ISSUES ON REMAND

In this remand redetermination, CBP has reevaluated the facts on the administrative

record with respect to the chemical composition of Fedmet's imported refractory bricks and

conducted additional laboratory testing.  In addition, CBP has ensured its compliance with 19

C.F.R. § 165.4.

### A. Determination of Evasion

*1. Covered Merchandise*

The scope of the Orders is as follows:

> The scope of these orders includes certain chemically-bonded
> (resin or pitch), magnesia carbon bricks with a magnesia
> component of at least 70 percent magnesia ("MgO") by weight,
> regardless of the source of raw materials for the MgO, with carbon
> levels ranging from trace amounts to 30 percent by weight,
> regardless of enhancements (for example, magnesia carbon bricks
> can be enhanced with coating, grinding, tar impregnation or
> coking, high temperature heat treatments, anti-slip treatments or
> metal casing) and regardless of whether or not antioxidants are
> present (for example, antioxidants can be added to the mix from
> trace amounts to 15 percent by weight as various metals, metal
> alloys, and metal carbides). Certain magnesia carbon bricks that
> are the subject of these orders are currently classifiable under
> subheadings 6902.10.1000, 6902.10.5000, 6815.91.0000,
> 6815.99.2000 and 6815.99.4000 of the Harmonized Tariff

---

[51] *See* Memorandum to the File, Subject: EAPA Investigation 7412 Remand: Additional CBP Lab Test Results and Information (Aug. 11, 2023) (adding to the record Laboratory Report No. CH20200430S (retest of CH2020200430) reported on July 28, 2023 (hereinafter, 0430 Retest)).  Due to a delay in conducting this retest of this set of brick samples, CBP was unable to place this information on the record at the same time as the retests of CH20201030 and CH20201071.  In light of the September 1, 2023 deadline to file the final remand redetermination and the limited time remaining to complete the remand proceeding, CBP placed this new factual information on the administrative record of this remand at the same time it issued  a draft version of this remand redetermination.  CBP has considered the parties' comments on this particular retest in the final remand redetermination.

[52] Letter from Counsel for Magnesia Carbon Bricks Fair Trade Committee to Victoria Cho, Re: Investigation of Fedmet Resources Corporation: Submission Of Comments Regarding Laboratory Results (July 17, 2023) (hereinafter, MCBFTC Lab Comments); Letter from Counsel for Fedmet Resources Corporation to Victoria Cho, Re: EAPA Case No. 7703: Comments on Laboratory Analysis Results (July 17, 2023) (hereinafter, Fedmet Lab Comments).

Schedule of the United States ("HTSUS"). While HTSUS
subheadings are provided for convenience and customs purposes,
the written description is dispositive.[53]

In prior scope rulings, Commerce has found that certain of Fedmet's Bastion® brand MAC bricks are not within the scope of the Orders.[54]  Specifically, following a remand in accordance with *Fedmet Resources Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014), Commerce determined that Fedmet's MAC bricks containing "approximately 8 to 15 percent aluminum oxide (chemical formula Al2O3), more commonly known as alumina, 3 to 15 percent carbon, 75 to 90 percent magnesia, as well as smaller amounts of silicon dioxide, calcium oxide, iron oxide, {and} titanium dioxide" were not subject to the Orders.[55]  This decision however was limited specifically to Fedmet's Bastion® bricks and was not intended to address all bricks designated as MAC bricks.[56]  In a later scope ruling, Commerce found that MCBs containing at least 5% of added alumina, as tested by x-ray diffraction (XRD) methodology, were not covered by the Orders.[57]

In determining whether Fedmet's imported bricks constituted covered merchandise, CBP considered the language of the scope contained in the Orders, as well as Commerce's two prior scope rulings applicable to MCBs, which counsel that the percentage of alumina contained in the bricks and the method of testing employed are determinative factors for whether a product is subject to the scope of the Orders.  In its Admin. Review, CBP concluded the following:

In this case, CBP conducted four (4) separate lab tests to determine the chemical composition of MACBs entered by Fedmet at different times

---

[53] The Orders.
[54] U.S. Dep't of Commerce, Final Results of Redetermination Pursuant to Court Remand, Magnesia Carbon Bricks from the People's Republic of China and Mexico, *Fedmet Resources Corporation v. United States*, Court No. 12-00215 (Ct. Int'l Trade Feb. 23, 2015) (Mar. 24, 2015), https://access.trade.gov/resources/remands/12-00215.pdf, (hereinafter, 2015 Fedmet Scope Ruling).
[55] *Id*. at 10.
[56] *Id*. at 10-11.
[57] U.S. Dep't of Commerce, Certain Magnesia Carbon Bricks from the People's Republic of China and Mexico: Final Scope Ruling – S&S Refractories (June 7, 2017) ("S&S Refractories Final Scope Ruling").

during the period of investigation. One of those lab tests occurred prior to the issuance of the Notice of Initiation and the other three occurred afterwards. For a majority of these lab results, the percentages for carbon, as well as alumina, fall outside of the required chemical composition of the Bastion brand MACBs in order to find that they are not subject to the AD/CV duty orders. For others, the magnesia levels are also outside of the chemical composition parameters to ensure that the MACBs are not subject to the AD/CV duty orders. The record also indicates that CBP did use the XRF testing method endorsed by Fedmet for at least some of these lab tests.

Given that the chemical composition of the MACBs tested by CBP places them within the scope of the AD/CV duty orders, the record indicates that Fedmet entered covered merchandise into the customs territory of the United States and, by entering the covered merchandise as entry type 01 instead of entry type 03, made a false statement that resulted in the nonpayment of AD/CV duties. This is substantial evidence of evasion.[58]

During this remand proceeding, CBP reevaluated its determination of evasion, and the results of the four separate laboratory tests.  In particular, CBP determined that its December 3 Determination and the Admin. Review did not sufficiently analyze the alumina content identified through each separate laboratory test result, and its initial finding of evasion was based on the fact that at least some tested bricks contained alumina in such quantities as to constitute subject MCBs.[59]  On remand, CBP undertook a review of each of the four laboratory test results, to determine whether specific tested samples constituted covered merchandise.  In doing so, CBP considered the testing methodologies used for identifying the concentration of elements in each refractory brick originally tested by CBP.  One of the tests, Lab Report No. SF20200826, was originally conducted using the XRD methodology.[60]  Another test, Lab Report No. CH20200430,[61] was conducted using XRD methodology for determining the presence of

---

[58] Admin. Review at 8.
[59] *See* December 3 Determination at 4-5; Admin. Review at 8.
[60] *See* U.S. Customs & Border Prot., Laboratory and Scientific Services, Laboratory Report No. SF202008260 (Aug. 7, 2020), C.R. 99.
[61] *See* C.R. 27.

minerals and metals, but the concentration of alumina was not directly tested.  Two tests, Lab

Report Nos. CH20201030,[62] CH20201071,[63] were originally conducted using XRD

methodology for identification of minerals and metals present in the brick and X-Ray

fluorescence (XRF) methodology for identifying concentrations of the elements present in the

brick.  Of note, in the two original laboratory reports where the concentration of elements was

determined using XRF methodology, the alumina content in the tested bricks was determined to

be over 20%.[64]  Given that neither the language of the scope, nor Commerce's previous scope

rulings address alumina content of over 20%, CBP could not determine whether the bricks

previously tested under CH20201030, and CH20201071 constituted covered merchandise.  In

addition, the remaining samples were tested using either XRD or XRF methodologies, and in

light of the arguments regarding proper testing methodology for refractory bricks raised by

Fedmet, CBP could not determine which samples constituted covered merchandise.  As such,

CBP referred all 11 brick samples to Commerce seeking a determination of whether they

constituted covered merchandise.[65]  Along with the referral, CBP provided Commerce all four

laboratory test results covering 11 brick samples, as well as full laboratory analysis associated

with each test result.[66]

In response to CBP's Covered Merchandise Referral, Commerce initiated a Covered

Merchandise Inquiry on July 20, 2022.[67]  The parties to this EAPA investigation, MCBFTC and

Fedmet, had an opportunity to participate in Commerce's proceeding.[68]  Commerce relied on its

previous scope rulings, i.e., the 2015 Fedmet Scope Ruling and the S&S Refractories Ruling, to

---

[62] *See* C.R. 102.
[63] *See* C.R. 90.
[64] *See* C.R. 102; C.R. 90.
[65] Covered Merchandise Referral at 3.
[66] *Id*. at Attachments 1-4.
[67] Covered Merchandise Decision at 2.
[68] *Id*.

find that the two sample bricks tested in Lab Report No. SF20200826,[69] constituted covered merchandise.[70]  In doing so, Commerce analyzed the information submitted by Fedmet and MCBFTC regarding the proper testing methodology for identifying the chemical composition and the concentration of each chemical compound in the bricks.[71]  Commerce found that XRD testing protocol allowed Commerce to identify the content of alumina in a tested brick as it exists at the time of importation.[72]  Because the two samples tested in Lab Report No. SF20200826,[73] were tested using XRD methodology and none of the tested bricks contained "an alumina content level sufficiently high enough to meet the (lower) percentage required in the S&S Refractories Ruling," Commerce found that the brick samples in SF20200826 were subject to the Orders.[74]

      With respect to the remaining nine samples tested in the remaining three lab reports, Commerce found that it could not determine whether the chemical composition of such bricks reflected a subject or non-subject brick.[75]  Commerce explained that in Lab Report No. CH20200430, covering four sample bricks, the alumina percentage was not a result of a direct test of alumina, but an assumption of alumina content based on subtracting measured magnesia and carbon levels from 100 percent.[76]  Commerce stated that the bricks also include a bonding agent and small amounts of other compounds, and, as such, attributing the entire content of the brick to either magnesia, carbon, or alumina, may or may not be appropriate.[77]  With respect to Lab Report Nos. CH20201030 and CH20201071, covering the remaining five sample bricks, Commerce stated that although both XRD and XRF tests were conducted, the alumina content

---

[69] *See* C.R. 99.
[70] Covered Merchandise Decision at 8.
[71] *Id*. at 13.
[72] *Id*. at 8.
[73] *See* C.R. 99.
[74] Covered Merchandise Decision at 11.
[75] *Id*. at 8.
[76] *Id*. at 13.
[77] *Id*.

listed in each test was obtained from the XRF test, and that the XRD test was only conducted for "the *presence* of certain compounds and elements," without the figures identifying the "*proportion* of these compounds and elements within the samples in their reports."[78]   Commerce concluded that it could not determine whether the bricks in these two tests were covered by the scope of the Orders.[79]

Commerce further stated the following when explaining its position regarding the various testing methodologies employed for identifying the chemical and physical characteristics of the bricks:

> The only test results in this inquiry that separately identified alumina and aluminum content percentages and reflect the physical characteristics of the merchandise upon importation were the results with composition percentages obtained from XRD tests.  This observation is not an exclusive endorsement of the XRD testing methodology.  Rather, this is a recognition of our position here, and in prior rulings relating to these Orders, that alumina is a defining characteristic of MAC bricks and that the test used to analyze the bricks must, therefore, identify alumina level upon importation in order to be a valid determinant of whether the brick is a MAC brick (or not).  Any test or calculation that separately measures and reports both the aluminum and alumina content percentages as they exist in the brick at the time of import, and can determine the alumina content level absent any oxidization caused by the testing itself, would be permissible.[80]

Commerce dismissed XRF and Individually Coupled Plasma (ICP) testing methodologies due to the following:

> {T}hese tests: (1) could not separately identify the quantity of the defining characteristic of MAC bricks (i.e., the alumina content at the time of importation); and (2) oxidized aluminum during the testing{.}[81]

---

[78] *Id*. (emphasis in original).
[79] *Id*.
[80] *Id.* at 8 (citations omitted).
[81] *Id*. at 6.

Nevertheless, Commerce declined to mandate the application of a specific chemical test or a sampling procedure, but noted that "regardless of the testing procedure selected by CBP, it is imperative that the test accurately measure the alumina content of the brick as imported, i.e., prior to any oxidization of aluminum due to a testing procedure, in order to determine accurately whether a product is a MAC brick or not (and, thus, within the scope of the Orders or not)."[82] Commerce explained that CBP is charged with determining the nature and composition of imported merchandise and the "technical expertise in selecting and applying testing methods to physical samples of imported merchandise rests with CBP."[83]

Commerce concluded that its prior rulings established a five percent alumina content threshold for MAC bricks, provided that the testing is done using a methodology that does not distort the alumina content of the brick and reflects the chemical composition of the brick upon importation.[84]  Commerce stated that the findings with respect to the "proper analysis of the chemical characteristics of imported refractory bricks apply to refractory bricks from China, regardless of the producer, exporter or importer of those products. . . ."[85]

CBP received Commerce's Covered Merchandise Decision on May 3, 2023.[86]  After reviewing Commerce's decision with respect to bricks tested in Lab Report Nos. CH20200430, CH20201030, and CH20201071, and its findings regarding the appropriate testing methodology for identifying the alumina content of refractory bricks, CBP determined that additional laboratory testing was required.  In light of Commerce's findings, CBP determined that the XRD testing methodology was appropriate for retesting the bricks tested in Lab Report Nos.

---

[82] *Id*. at 7.
[83] *Id*. (citations omitted).
[84] *Id*. at 14.
[85] *Id*. at 15.
[86] *See* May 3 Letter.

CH20200430, CH20201030, and CH20201071.  CBP's decision to retest was based on the following factors: (1) Commerce found that the five percent alumina threshold for MAC bricks applies if the test specifically identifies alumina content in the brick; and (2) the XRD test allows CBP to identify the concentration of specific chemical compounds in a sample refractory brick.[87]

  2.  *Results of Laboratory Retests*

In June 2023 and July 2023, CBP conducted retests of the brick samples tested in Lab Report Nos. CH20200430, CH20201030, and CH20201071.  The results of each retest, as well as the results of the original laboratory tests, are provided in the chart below:[88]

| Lab Report No. | Sample | Original Test Results ~% | | | Results of the XRD Retest ~% | | | |
|---|---|---|---|---|---|---|---|---|
| | | MgO | C | AL203 | MgO | C | Al2O3 | Al |
| CH20201071 | Brick 1 | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] |
| | Brick 2 | [ # ] | [ # ] | [ # ] | | | | |
| | Brick 3 | [ # ] | [ # ] | [ # ] | | | | |
| CH20201030 | Brick 1 | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ]89 |
| | Brick 2 | [ # ] | [ # ] | [ # ] | | | | |
| CH20200430 | Brick 1 | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] |
| | Brick 2 | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] |
| | Brick 3 | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] |
| | Brick 4 | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] | [ # ] |

For the CH20201030 and CH20201071 Retests, CBP collected samples from a randomly selected brick from each laboratory test.[90]  Three different samples were taken from each brick

[87] CBP did not utilize the XRF test results because, according to Commerce, such test cannot differentiate between aluminum and alumina content, and Commerce's Covered Merchandise Decision requires that the testing used to determine whether refractory bricks contain more than five percent alumina is conducted using a methodology that differentiates between the two.  *See* Covered Merchandise Decision at 7-8.
[88] *See* C.R. 27, C.R. 30, C.R. 90, and C.R. 102; *see also* 0430 Retest, 1030 Retest, and 1071 Retest.
[89] Given the substantial similarity between the sample bricks tested in Lab Report No. CH20201030 and CH20201071, CBP only conducted retests for one of the bricks covered by each respective report, as opposed to analyzing each brick separately.
[90] *See* 1030 Retest; 1071 Retest.

and the samples were ground until powdered in a homogenous form.[91]  For the XRD retest of

Lab Report No, CH20200430, CBP retested all four previously tested samples.[92]

In addition to the results of the retests, CBP placed full testing methodology and

supporting documentation on the administrative record of this remand and provided business

confidential versions of such documents to Fedmet because such information pertains to

Fedmet's products, and therefore, Fedmet would be in the best position to confirm what is or is

not confidential information.

### 3.  Finding of Evasion

CBP incorporates by reference the factual background outlined in the December 3

Determination.[93]  In this remand, CBP only analyzes the issue of whether Fedmet's imported

product constitutes covered merchandise within the meaning of 19 U.S.C. § 1517(a)(3).[94]  As

CBP stated in the Admin. Review, the single most important factor in determining whether

Fedmet's refractory bricks constitute covered merchandise is the chemical composition of the

product.[95]  As described above, Commerce's Covered Merchandise Decision instructs that

Fedmet's bricks are covered merchandise if the alumina content, as identified by an XRD test or

another laboratory test that specifically measures the alumina content, is below 5% by weight,

and the product otherwise meets the chemical composition described in the language of the

scope, i.e., containing up to 30% carbon and at least 70% magnesia.[96]

---

[91] 1030 Retest at 85; 1071 Retest at 83.
[92] *See* 0430 Retest.
[93] *See* December 3 Determination at 2-3, 5-6.
[94] "The term 'covered merchandise' means merchandise that is subject to— (A) an antidumping duty order issued under section 1673e of this title; or (B) a countervailing duty order issued under section 1671e of this title." 19 U.S.C. § 1517(a)(3).
[95] *See* Admin. Review at 7.
[96] *See* Covered Merchandise Decision at 2, 14.

The XRD retest conducted by CBP shows that bricks tested for Lab Report No. CH20201071 contain [  #  ] % magnesia, [  #  ] % carbon, and [  #  ] % alumina.[97]  Because the alumina content is below 5%, and the tested product contains less than 30% carbon and at least 70% magnesia, CBP concludes that the refractory bricks tested for Lab Report. No. CH20201071 constitute covered merchandise.

XRD Retest of Lab Report No. CH20201030 shows that bricks tested in this lab report contain [  #  ] % magnesia, [  #  ] % carbon, and [  #  ] % alumina.[98]  Because the alumina content is below 5%, and the tested product contains less than 30% carbon and at least 70% magnesia, CBP concludes that the refractory bricks tested for Lab Report. No. CH20201030 constitute covered merchandise.

XRD Retest of Lab Report No. CH20200430 shows that Brick 1 tested in this lab report contains [  #  ] % magnesia, [  #  ] % carbon, and [  #  ] % alumina.[99]  Brick 2 tested in this lab report contains [  #  ] % magnesia, [  #  ] % carbon, and [  #  ] % alumina.[100]  Brick 3 tested in the 0430 Retest contains [  #  ] % magnesia, [  #  ] % carbon, and [  #  ] % alumina.[101]  Finally, Brick 4 contains [  #  ] % magnesia, [  #  ] % carbon, and [  #  ] % alumina.[102]  Because the alumina content is below 5%, and the tested product contains less than 30% carbon and at least 70% magnesia, CBP concludes that the refractory bricks, except for Bricks 1 and 3, originally tested under Lab Report. No. CH20200430, constitute covered merchandise.

---

[97] *See* 1071 Retest.
[98] *See* 1030 Retest.
[99] 0430 Retest.
[100] *Id.*
[101] *Id.*
[102] *Id.*

Finally, Commerce found that Fedmet's bricks tested under Lab Report No. SF20200826 constituted covered merchandise because "none of the bricks included in this report have an alumina content level sufficiently high enough to meet the" 5% alumina content threshold.[103]

CBP concludes that all, except two of Fedmet's brick samples tested by CBP, are subject to the Orders. Fedmet did not declare the covered merchandise as subject to the Orders and entered the covered merchandise as entry type "01"[104] instead of entry type "03"[105] which constitutes a false statement that resulted in nonpayment of AD/CVD. Thus, substantial evidence on the record demonstrates that Fedmet entered covered merchandise into the customs territory of the United States through evasion. With respect to the two bricks tested by CBP that contain aluminum content above 5%, CBP finds that the bricks are not subject MCBs. To the extent the entries subject to the EAPA investigation contain bricks with the same chemical composition as these two bricks, CBP finds no evasion. However, the burden is on Fedmet to show, including by providing XRD test results (or any other test result using a methodology capable of distinguishing between aluminum and alumina content at the time of importation) for its merchandise, that its entries contain non-subject MAC bricks with the chemical composition similar to that of Brick 1 or 3.[106]

### 4. Arguments from Interested Parties

On July 17, 2023, MCBFTC and Fedmet submitted comments to the laboratory reports for XRD retests of CH20201071 and CH20201030.[107] MCBFTC points out that the laboratory

---

[103] Covered Merchandise Decision at 11.
[104] Entry Type "01" is reserved for free and dutiable, non-AD/CVD, entries. U.S. Customs and Border Protection, ACE Entry Summary Instructions, 2.4a, https://www.cbp.gov/sites/default/files/assets/documents/2016-Sep/ace_es_instructions%202.4a%20%2809-02-2016%29.pdf.
[105] Entries subject to an AD/CVD order must be coded as "03." U.S. Customs and Border Protection, CBP Form 7501 Instructions at 1, https://www.cbp.gov/sites/default/files/assets/documents/2021-Sep/CBP Form 7501.pdf.
[106] 19 U.S.C. § 1484 (providing that importers must exercise reasonable care when making entry and providing such information as necessary to enable CBP to determine, *inter alia*, applicable duty rate to the merchandise).
[107] *See* MBCFTC Lab Comments and Fedmet Lab Comments.

reports for the XRD retests suggest that the bricks tested contain less than 5% alumina, and, as such, do not qualify for a MAC brick exception.[108]  MCBFTC further posits that the results are consistent with the XRD testing results already on the administrative record.[109]  MCBFTC concludes that "{b}ecause every test performed thus far on Fedmet's bricks using a Commerce-sanctioned protocol (i.e., one that does not oxidize aluminum and convert it into alumina)[110] showed the product to be in-scope, CBP should continue to find that Fedmet's entries evaded the antidumping and countervailing duty orders."[111]  As discussed above, CBP agrees with MCBFTC that the XRD retests of Lab Report No. CH20201071 and Lab Report No. CH20201030 show that the merchandise is subject to the Order.

Fedmet takes issue with CBP's sampling and testing methodology and posits that the results are inconsistent with Commerce's Covered Merchandise Decision.[112]

First, Fedmet takes issue with CBP's method for taking samples using "hammer and chisel," which, according to Fedmet, is inappropriate for inhomogeneous refractory bricks that are composed of large grains, small grains, and powders, because taking a sample from the surface will not produce a sample that allows measurement of the overall composition of the brick.[113]  We disagree.  At the outset, CBP possesses technical expertise in selecting and applying testing methods to physical samples of imported merchandise.[114]  LSS, as the forensic and scientific arm of CBP, provides forensic and scientific testing in the area of trade enforcement, weapons of mass destruction, intellectual property rights, and narcotics

---

[108] MCBFTC Lab Comments at 2.
[109] Id.
[110] CBP notes that XRF testing results were not relied upon due to Commerce's findings in the Covered Merchandise Decision that the 5% threshold for alumina content applies when the tests are conducted using a methodology that separately identifies alumina and aluminum.
[111] MCBFTC Lab Comments at 2-3.
[112] Fedmet Lab Comments at 2.
[113] Id. at 3.
[114] Procedures for examination and testing of merchandise are outlined in 19 C.F.R. Part 151.

enforcement and, coordinates technical and scientific support to all CBP trade and border

protection activities.[115]  An importer cannot dictate CBP's sampling protocol.  Second, Fedmet

has placed no information on the administrative record of this proceeding that would support its

position that CBP's sampling procedures were flawed.  Third, as stated above, samples were

chosen from three different locations[116] of the randomly selected brick, and the pieces that were

broken off with a hammer and chisel included the exterior of the brick as well as the interior

material of the brick.[117]  Finally, CBP ground the samples into a powder prior to testing to

account for the inhomogeneous nature of the bricks.  That said, Fedmet fails to account that its

argument regarding sample bricks consisting of different size grains and powders would be

applicable to any other type of laboratory testing, not just XRD testing.

Next, Fedmet argues that CBP's firing of the samples prior to performing the XRD test

results in oxidization of the samples, and thus is inconsistent with Commerce's directive that the

samples are tested using a methodology that does not result in oxidization of the samples.[118]  We

disagree.  First, Fedmet has not placed any information on the record that would suggest that

firing samples to 1000 degrees Celsius for eight hours prior to the XRD test yields an inaccurate

reporting of the chemical composition of the refractory bricks.  Commerce's directive is clear

that selecting and administering testing on samples of imported merchandise are within CBP's

authority and discretion.[119]  As demonstrated by the full laboratory analysis of retests of Lab

Report Nos. CH20201071 and CH20201030, the samples were fired in order to remove carbon

---

[115] *See* U.S. Customs and Border Protection, Laboratories and Scientific Services, https://www.cbp.gov/about/labs-scientific-svcs.
[116] 1030 Retest at 85; 1071 Retest at 83; *see also generally* 19 C.F.R. Part 151.
[117] Functionally, it would be very difficult to just test the outside layer of the brick, due to the breakage of the outermost area during sample collection.
[118] Fedmet Lab Comments at 4.
[119] *See, e.g.,* Covered Merchandise Decision at 5, 12, 14-15; *see also generally* 19 C.F.R. Part 151.

from the samples and allow accurate measurement of remaining chemical compounds.[120]

Carbon is a complex material to analyze using an XRD test and, and as such, CBP decided to fire

the samples to remove carbon and allow accurate XRD testing of other compounds, and the

amount of carbon was calculated later as a separate step by measuring carbon loss by weight.[121]

Fedmet argues that the firing fully oxidized the samples into "dried quartz," and as a result, the

alumina content was not measured in a state at the time of importation, as directed by

Commerce.[122]   Fedmet's argument is illogical.   First, quartz is a completely different compound,

silicon oxide ($SiO_2$), and has no bearing on the content of alumina in a sample.[123]   Second, CBP

accounted for oxidization of aluminum that took place during the firing by first calculating the

ratio between aluminum and alumina prior to firing, and then using the ratios to calculate the

amount of aluminum oxidized into alumina during the firing.[124]   Using the known ratio of

alumina versus aluminum prior to oxidization by firing allowed CBP to properly assess the

sample after the firing.[125]   Fedmet does not provide any evidence that would suggest that CBP's

methodology was flawed.   As such, unlike what Fedmet suggests, CBP's test results, are not

distorted due to oxidization by firing, and account for the composition of bricks as imported.

Finally, if any tests were inaccurate, such that aluminum was oxidized during the testing process

and CBP did not perform the calculations correctly to account for such oxidization, the result

---

[120] *See* 1030 Retest at 85-86; *see also* 1071 Retest at 83-84.

[121] *Compare* 1030 Retest at 48 (showing analysis of unfired brick where carbon is estimated at 30.23% and corundum, alumina, is 2.15%) *with* 1030 Retest at 60 (showing analysis of fired brick with no carbon, as it has been burnt off, but the weight loss of carbon was less than 30% (*see* 1030 Retest at 83 showing approximately [ # ]% weight of carbon) and thus showing that the analysis of the unfired brick was erroneous); *see also id.* at 83 (showing the calculations to determine what percentage of the aluminum was not oxidized before firing which was then used to estimate the percentage the alumina and aluminum after firing).   CBP notes that 0430 Retest was conducted without firing the bricks.   That said, the alumina values in the 0430 retest are still below the 5% threshold.   *See* 0430 Retest.

[122] Fedmet Lab Comments at 4 (citing 1071 Retest at  86; 1030 Retest at 88).

[123] *See* 1030 Retest at 45 (showing compounds identified in an unfired brick as magnesium oxide, aluminum oxide, aluminum, and carbon, with no quartz).

[124] *See* 1030 Retest at 83 (showing calculations of aluminum versus alumina ratio in the unfired sample).

[125] *Id.*; *see also supra* note 119.

would have shown a higher alumina content, which in turn would help Fedmet in making an argument that its bricks qualify for a 5% MAC brick exclusion threshold.[126]

Fedmet also argues that the lab conducted the XRD test on non-fired samples, but did not use such test results to calculate the composition of the bricks.[127] Fedmet posits that the test results are inconsistent with Commerce's direction in the Covered Merchandise Decision.[128] As discussed above, non-fired samples were used to determine the ratio of alumina versus aluminum in the samples. In order to get the most accurate measurement, the samples were fired to a high temperature to remove carbon due to its complex nature. The ratio of alumina versus aluminum was then used to calculate the actual values after the firing.[129] Fedmet has not placed any information on the record that suggests that CBP's calculations are invalid.

Fedmet also contends that XRD tests on non-fired samples that CBP elected not to rely on show abnormally high carbon content, which means that the samples were not representative of the bricks as a whole.[130] As discussed above, CBP took three different samples from different locations on the brick. CBP concluded that the carbon content was consistent across the three samples.[131] In addition, the carbon content between retests of Lab Report Nos. CH20201071 and CH20201030 was consistent with the carbon content determined in Lab Report No. SF20200876. Finally, if a brick is in fact as inhomogeneous as Fedmet claims, Fedmet could argue that any sampling procedure, short of analyzing the entire brick is insufficient to identify the true chemical composition of the brick. Not only would that make analysis entirely impractical but

---

[126] *See* 1030 Retest at 60 (showing that there are no peaks in the graph for aluminum, indicating that firing oxidized all the aluminum to alumina).
[127] Fedmet Lab Comments at 5.
[128] *Id.*
[129] *See* 1030 Retest at 83; 1071 Retest at 81.
[130] Fedmet Lab Comments at 4-5.
[131] *See* 1030 Retest at 83 (showing carbon content at [ # ] for all three samples); 1071 Retest at 81 (showing carbon content at [ # ] for all three samples); *see also supra* note 118.

exceptionally difficult to accept as it could just be perpetually disputed as not being a representative sample.

Fedmet next argues that XRD testing is not appropriate for inhomogeneous materials such as refractory bricks.[132]  As discussed above, to account for the inhomogeneous nature, CBP took samples from multiple locations on the brick and ground down the samples to a fine powder prior to testing.  Fedmet states that the XRD standards employed by CBP, ASTM D934-22 and JIS K0131,[133] themselves are not applicable to inhomogeneous materials such as refractory bricks.  Specifically, Fedmet argues, without citing to any record material, that ASTM D934-22 standard is not appropriate for testing materials where any component is between 1% and 40%.[134]  As stated above, CBP accounted for the issue of inhomogeneity by using samples ground into fine, uniform powder and firing the samples to estimate the quantity of the component materials more accurately.[135]

Fedmet contends that CBP's calculations using *Rietveld*[136] analysis of the fired samples resulted in a "depressed alumina content estimate."[137]  In fact, Fedmet's argument is illogical. While the firing of the samples to remove carbon resulted in oxidization of the aluminum into alumina, CBP determined that removing carbon and accounting for its total value in that manner would produce more accurate XRD test results.  CBP used *Rietveld* analysis to then calculate the alumina content based on the ratio of aluminum and alumina prior to firing.[138]  Oxidization of aluminum during firing would result in a higher alumina content, not "depressed" alumina

---

[132] Fedmet Lab Comments at 5-6.
[133] *Id*.
[134] *Id*.
[135] *See* 1030 Retest at 87; 1071 Retest at 86.
[136] *See* 1071 Retest at 82, 84-86.
[137] Fedmet Lab Comments at 7.
[138] 1030 Retest at 84, 86-88; 1071 Retest 82, 84-86.

content.[139] Fedmet does not point to any information on the record that would suggest that the aluminum suppression was such that it resulted in inaccurate results.

Fedmet next argues that the results of the prior XRF testing in Lab Report Nos. CH20201071 and CH20201030 are irreconcilable with the results received in the XRD retests.[140] First, Fedmet's arguments are misplaced, because Commerce's Covered Merchandise Decision specifically indicated it could not determine whether the bricks tested under Lab Report Nos. CH20201071 and CH20201030 were subject to the Orders because the XRF testing methodology did not separately measure the alumina content.[141] Thus, the XRD retests were necessary to determine whether the bricks constituted covered merchandise. Further, we note that as shown in the table above, the alumina content resulting from the XRF testing is significantly different from the alumina content identified in the XRD retest. As a general matter, XRF and XRD can be used as complementary techniques - to determine the presence of elements using XRF and to determine how the elements are distributed into crystals by XRD. It is possible that the results are vastly different because the XRF method cannot detect lighter elements, such as carbon, and as a result, other elements, such as aluminum and magnesium, may be overrepresented.[142] Lastly, given that Commerce's findings require that the 5% alumina content threshold is established by an XRD test, arguments related to prior XRF testing are inapplicable. Fedmet further contends that the JIS K0131 standard used by CBP is inappropriate for irregularly shaped

---

[139] *Compare* 1030 Retest at 48 (showing alumina (corundum) content of 2.15% prior to firing) *with* 1030 Retest at 60 (showing alumina (corundum) content as [ # ]%).
[140] Fedmet's Lab Comments 7-8.
[141] Covered Merchandise Decision at 13.
[142] *See* U.S. Customs & Border Prot., Laboratory and Scientific Services, Full Report for Laboratory Report No. CH20201071 (July 21, 2020), at pp. 40-69 (detailed results of XRF scan showing no carbon), which was placed on the administrative record on April 28, 2022.

or inhomogeneous materials.[143]  As stated above, the lab accounted for the nature of the bricks by taking samples from three separate locations, and grounding down the samples before testing.

Finally, Fedmet argues that the XRD retests still support Fedmet's contention that the bricks are outside the scope of the Orders.[144]  Fedmet states that the average alumina content in the 1071 Retest is above the 5% threshold.[145]  Fedmet appears to be pointing to the alumina values prior to firing the brick, which, as discussed above, were not final results of the analysis. These values do not represent the final result of the laboratory test with respect to alumina content in the tested brick.[146]  The final results of the laboratory tests show alumina content well below 5%.[147]  Fedmet also states that the average magnesia content in the 1030 Retest is below 70% and, as such, the tested brick does not qualify as a covered MCB.[148]  Again, Fedmet is pointing to values from the XRD test conducted on the unfired brick samples.[149]  The final results of the laboratory testing show that the magnesia content in the tested brick is well above 70%.[150]  As such Fedmet's arguments are unavailing.

CBP is authorized by law to conduct the examination of merchandise, take samples, and conduct the laboratory tests of the merchandise.[151]  Overall, Fedmet has not placed any information on the record to call into question the laboratory analysis performed by the experts at CBP LSS.  The reports provide detailed information regarding the methodology employed by CBP and the steps CBP took during the testing.  As such, CBP disagrees with Fedmet's arguments regarding the validity of the tests.

---

[143] Fedmet Lab Comments at 5-6.
[144] *Id*. at 8-9.
[145] *Id*. at 8 (citing 1071 Retest at 89).
[146] 1071 Retest at 88.
[147] *Id*. at 1.
[148] Fedmet Lab Comments at 8 (citing 1030 Retest at 91).
[149] *See* 1030 Retest at 90.
[150] *Id*. at 2.
[151] *See* 19 U.S.C. § 1499; 19 C.F.R. Part 151.

26

**B.  Public Summaries of Business Confidential Information**

During this remand proceeding, CBP complied with the requirements of 19 C.F.R. §§

165.4(a)(2) and (e).  Pursuant to the applicable CBP regulations, an interested party may claim

confidential treatment for information it submits in connection with an investigation initiated in

accordance with 19 U.S.C. § 1517.[152]  Such treatment will be granted as long as the request and

submission satisfy the provisions of 19 C.F.R. § 165.4(a) and the information consists of trade

secrets and commercial or financial information obtained from any person, which is privileged or

confidential in accordance with 5 U.S.C. § 552(b)(4).[153]  Certain information cannot be protected

as confidential, including, *inter alia*, the name of the party to the investigation submitting the

information, name and address of the importer against whom an allegation is made, description

of the covered merchandise, and the applicable AD/CVD orders.[154]  To the extent that business

confidential treatment is sought, the party claiming such treatment must indicate precisely which

information must be protected by enclosing the relevant information within single brackets; the

party must also clearly state that its submission contains business confidential information and

provide an explanation of why any bracketed information is entitled to such treatment.[155]

Moreover, a party must submit a public version, which is clearly marked, of any submission for

which it claims business confidential treatment.[156]  This public version must contain a summary

of the bracketed information in sufficient detail to permit a reasonable understanding of the

substance of the information.[157]  If summarization is not possible, the submitting party must

provide an explanation to support as much.[158]

---

[152] *See* 19 C.F.R. § 165.4.
[153] *Id.*
[154] *See* 19 C.F.R. § 165.4(c).
[155] 19 C.F.R. § 165.4(a)(1).
[156] 19 C.F.R. § 165.4(a)(2).
[157] *Id.*
[158] *Id.*

CBP reviewed documents it previously placed on the administrative record to determine whether revisions to bracketing of confidential information were necessary and to revise the public versions of such documents to include public summaries to comply with the requirements of 19 C.F.R. §§ 165.4(a)(1) and (a)(2).  To that end, CBP also requested that the parties to the remand proceeding review documents they previously submitted to revise public versions of those previously submitted documents to comply with the requirements of § 165.4(a)(2).[159]  CBP also sent letters to end users and manufacturers seeking public summaries given that CBP had obtained confidential information from these entities during the original investigation.[160] However, the end users and the manufacturers did not submit any revised public versions during this remand proceeding.[161]  For any information previously omitted from the public record during the investigation, CBP afforded the parties an opportunity to submit rebuttal information and written arguments.  CBP also allowed Fedmet to submit any rebuttal information and arguments in response to the confidential versions of the lab reports.

Further, CBP determined that the lab reports, C.R. 27, 30, 90 and 99, contained business confidential information that belonged to Fedmet, i.e., the precise composition of Fedmet's imported product.  As a result, CBP allowed Fedmet to review confidential versions of the lab reports that it previously withheld as business confidential information during the original investigation, and requested that Fedmet provide public summaries of its business confidential information contained therein.[162]

---

[159] TRLED Letters to Parties for Public Summaries.
[160] *See supra* note 20.
[161] CBP did not rely on the information received from the end users in its Admin. Review and is not relying on such information in finding evasion in this remand redetermination.
[162] *See supra* note 23.

The revised public versions of CBP-generated documents that were placed on the administrative record comply with the public summary requirements under § 165.4(a)(2). Specifically, the regulations require that the public summary of confidential business information contain "sufficient detail to permit a reasonable understanding of the substance of the information."[163]  In each document, CBP summarized business confidential information with reasonable specificity to permit a reasonable understanding of the underlying substance.  The revised public versions of documents containing confidential import data describe the information included in each document, while explaining that the summarization of data itself is not possible.[164]  Such summary permits a reasonable understanding that the document contains business confidential import data, elements of such data, and relevant dates.  CBP also found that the documents that Fedmet and the alleger submitted contained public summaries that met the requirements of § 165.4(a)(2).

Fedmet argued that CBP failed to provide Fedmet with a meaningful opportunity to rebut and clarify the results of laboratory testing by failing to provide Fedmet at minimum with an "explanation of the type of chemical analysis performed, the equipment used, and the manner in which the samples were prepared."[165]  Fedmet further argued that "TRLED should also provide the actual outputs of the testing performed, including equipment readings, software outputs, spectrometer graphs, x-ray or optical images, any notes by the personnel performing the test, and any other outputs or readings used by the laboratory to generate the values and percentages reported in the lab reports."[166]  While CBP had found that additional testing methodology was not relevant for purposes of the EAPA investigation, full laboratory reports for the original tests

---

[163] 19 C.F.R. § 165.4(a)(2).
[164] *See supra* note 26.
[165] *See* Fedmet March 2022 Written Comments at 7.
[166] *Id*. at 7-8.

conducted by CBP were provided to Fedmet and MCBFTC when CBP submitted the Covered

Merchandise Referral to Commerce during this remand proceeding.[167]  In addition, as described

above, CBP placed the full laboratory reports and supporting documentation for the XRD retests

on the record of this proceeding.[168]  Parties have had the opportunity to submit rebuttal

information and comments to the testing methodology.  As such, Fedmet's arguments are, at this

time, moot.[169]  Fedmet does not challenge the sufficiency of public summaries provided by CBP.

## V.   COMMENTS BY PARTIES TO THE INVESTIGATION

## 1.   Comments by MCBFTC

- MCBFTC agrees with the draft remand redetermination.[170]

- MCBFTC reserves the right to raise new arguments at the CIT given that it did
  not have access to the business confidential versions of the additional laboratory
  reports prepared and placed on the record during this remand proceeding.[171]

- MCBFTC also renews its request for confidential versions of the laboratory
  reports.[172]

---

[167] *See* Email from Kareen Campbell to Counsel for Fedmet Resources Corporation and Counsel for Magnesia Carbon Bricks Fair Trade Committee notifying counsel that the referral documents had been uploaded into CMS for review (July 14, 2022;4:07 PM EDT).
[168] *See* 1030 Retest, 1071 Retest, 0430 Retest.
[169] The Federal Circuit's decision in *Royal Brush Manufacturing Inc. v. United States*, __ F.4th __, Slip Op. No. 2022-1226 (Fed. Cir. July 27, 2023), had not become final while this matter was on remand.  Nevertheless, CBP notes that Fedmet was provided access to its own business confidential information during this remand proceeding, mainly, the lab results detailing the chemical composition of its bricks.  The only issue in this matter is whether Fedmet's imported product constitutes covered merchandise, and Fedmet has not raised any legal issues regarding any other business confidential information on the administrative record that was submitted by the manufacturer and end users.  Accordingly, if the *Royal Brush* decision does become final, CBP believes that its determination is in compliance with the appellate court's decision.  In addition, the timeline of this remand proceeding does not allow CBP to implement administrative protective order procedures and still issue the remand determination by the deadline established by the Court.
[170] MCBFTC Comments on Draft Remand at 1.
[171] *Id*. at 1-2.
[172] *Id*. at note 1.

*CBP Position*

As discussed above, CBP did not release the confidential versions of the laboratory reports to MCBFTC because such reports contain confidential business information that belongs to Fedmet.  In addition, the decision in *Royal Brush Manufacturing Inc. v. United States*, __ F.4th __, Slip Op. No. 2022-1226 (Fed. Cir. July 27, 2023), did not become final during this remand proceeding.  Furthermore, MCBFTC was not the party under investigation in this EAPA proceeding.  Therefore, CBP complied with the applicable law and regulations in effect at the time it determined which information was subject to business confidential treatment.  Moreover, if the Royal Brush decision does become final, CBP believes its determination is in compliance therewith.

## 2.   Comments by Fedmet

- Fedmet disagrees with the remand redetermination and argues that the administrative record does not support a conclusion that Fedmet evaded the Orders.[173]

- Fedmet argues that CBP's testing methodologies used on remand are flawed and have yielded inconsistent and anomalous results.[174]  Fedmet contends that because CBP has employed multiple testing methodologies, the results of which are inconsistent with each other, none of CBP's tests is reliable.[175]

- Fedmet contends that the same sample of bricks from CH20200430 were retested on remand using two different testing methodologies.  As a result, the original four samples from CH20200430 have been tested three times, once during the

---

[173] *See* Fedmet Comments on Draft Remand at 3, 12-13.
[174] *Id*. at 2.
[175] *Id*. at 2-3.

investigation, and twice during the remand, each resulting in 12 measurements for the alumina and magnesia content.  Eleven of the 12 measurements would establish the bricks as non-subject merchandise.[176]

- Fedmet argues that CBP's draft remand redetermination does not provide a justification for the differing test results.[177]  Oxidization of aluminum during testing does not explain the large variation of alumina content between the test results.[178]

- Fedmet continues to take issue with CBP's sampling methodology as applied to inhomogeneous materials such as MCBs, arguing that the samples should have been taken using a saw as opposed to a hammer and chisel.[179]

- Fedmet contends that it is limited in commenting on CBP's testing methodologies, and has not been able to place any information regarding testing and sampling protocols used by CBP on the administrative record.[180]

- Fedmet disagrees with the explanation provided by CBP and argues that CBP's decision to fire the samples during the laboratory analysis does not comport with Commerce's directive to test the bricks in the same condition as they are imported.[181]

- Fedmet finally contends that CBP's XRD retests "estimate" the amount of alumina instead of measuring the alumina directly.[182]

---

[176] *Id*. at 3-4.
[177] *Id*. at 5.
[178] *Id*. at 7-8.
[179] *Id*. at 8-9.
[180] *Id*. at 9-10.
[181] *Id*. at 10.
[182] *Id*. at 11.

- Fedmet argues that CBP failed to consider the information Fedmet and the manufacturer submitted during the investigation.[183]

*CBP Position*

CBP disagrees with Fedmet's comments.  CBP has adequately explained its testing methodology on remand and provided parties with an opportunity to submit information and comments.

We disagree with Fedmet's first argument that the 1030 and 1071 Retests are flawed and anomalous.  As explained above, CBP first measured the concentration of aluminum and alumina in the samples, fired the samples in order to accurately calculate the amount of carbon, conducted the XRD test on the fired samples, and used the pre-firing ratio of aluminum versus alumina to calculate the correct amount of alumina in the samples prior to firing.[184]  CBP's tests and calculations are scientifically sound and supported by the extensive analysis and calculations on the administrative record.

With respect to the 0430 Retest, Fedmet argues that CBP conducted three sets of tests on the same four sample bricks, which yielded different and irreconcilable results.[185]  According to Fedmet, the samples were first tested during the investigation, and then twice during this remand.[186]  First, as discussed above, Commerce concluded that the original results in Laboratory Report No. CH20200430 were inconclusive because CBP did not directly test the alumina content but instead, estimated the concentration of alumina by simply subtracting magnesia and carbon content from 100%.[187]  As such, on remand, CBP determined that an

---

[183] *Id*. at 12.
[184] *Supra* pp. 21-25.
[185] Fedmet Comments on Draft Remand at 3.
[186] *Id*.
[187] Covered Merchandise Decision at 13.

additional test for the samples tested in CH20200430 using a methodology that is capable to separately measure the content of alumina was necessary.  During the retest, CBP first conducted an XRF test to identify the presence of elements in the samples; these semi-quantitative XRF results were only used as a guide for conducting an XRD analysis.[188]  The XRF test was the first step in the analysis, and not designed to produce a final result of the composition of the bricks.  As discussed above, CBP did not rely on the results of the XRF tests, because such tests cannot separately measure alumina.[189]  The XRD retest of 0430 shows that two of the four brick samples tested constitute covered merchandise.[190]  Fedmet's argument that the 11 out of the 12 measurements indicate that the samples are outside the scope of the Orders is inaccurate.[191]  The table that Fedmet provides[192] includes results from the original CH20200430 (which Commerce found to be inadequate) results of a preliminary XRF test, and the final results of the 0430 Retest.  Fedmet is taking CBP's preliminary calculations out of context.  Fedmet argues that CBP's test results do not reliably establish chemical composition of the tested bricks because CBP "can keep testing the same samples until it finally obtains a result that places the bricks within the scope of the Orders in an effort to validate its flawed original determinations."[193]  Again, Fedmet is pointing to preliminary tests and calculations supporting the 0430 Retest.  As the extensive supporting documentation for the laboratory results shows, laboratory testing to identify chemical composition of complex materials such as MCBs is a multi-step process and several preliminary tests and calculations are required in order to accurately account for the distribution of various elements and minerals in the sample.  Contrary to Fedmet's argument,

---

[188] 0430 Retest at 3.
[189] *Supra* p.15.
[190] *See supra* p. 16.
[191] Fedmet Comments on Draft Remand at 4.
[192] *Id*.
[193] *Id*. at 5.

CBP did not continuously test samples until a result adverse to Fedmet was reached but engaged in a thorough and methodical process to ensure that the final testing results were accurate.

Fedmet further argues that CBP must provide a "principled basis" for the decision to rely on the results of the XRD retest "while giving no weight to the other three sets of test results on the record (the manufacturer's testing, the original CBP lab test results, and the XRF re-test)."[194] As explained above, on remand, CBP determined that the XRD retest was necessary based on Commerce's finding that XRF tests did not conclusively identify the alumina content of refractory bricks.[195]  Commerce found that "alumina is a defining characteristic of MAC bricks" and thus "{a}ny test or calculation that separately measures and reports both the aluminum and alumina content percentages as they exist in the brick at the time of import, and can determine the alumina content level absent any oxidization caused by the testing itself, would be permissible."[196]  In reaching this conclusion, Commerce analyzed XRF and ICP methodologies put forth by Fedmet during the covered merchandise proceeding.[197]  According to the Covered Merchandise Decision, the 5% alumina threshold is only applicable if the content is measured using a laboratory test that separately identifies alumina and aluminum content.[198]  Given Commerce's conclusions, CBP conducted the retest using XRD methodology.  Fedmet's arguments regarding a proper testing methodology were considered and rejected by Commerce, and therefore, CBP need not reanalyze each argument again here.

---

[194] Fedmet Comments on Draft Remand at 6.  Fedmet's reference to "XRF retest" is a fallacy.  CBP did not conduct the retests using XRF methodology, but XRF was used in the 0430 retest as an additional tool to determine the presence of chemical elements in the sample.  This is a common practice.
[195] *See* Covered Merchandise Decision at 8.
[196] *Id.*
[197] *Id.* at 6-7.
[198] *Id.* at 14.

To further its point regarding the selection of proper testing methodology, Fedmet argues that the XRF and XRD test results are irreconcilable in the 0430 Retest.[199]  Again, the XRF test on the samples analyzed in the 0430 Retest was used as a guide to inform the subsequent XRD analysis.[200]  The difference in the measured alumina content between the XRD and XRF tests can be explained, not by oxidization, as Fedmet mistakenly points out, but by the fact that the XRF test does not measure carbon, and as a result, the presence of carbon can alter the measurements of other elements, such as aluminum, in the sample.[201]  Moreover, Commerce has dismissed the XRF methodology as inappropriate because it does not separately measure the alumina content.

Fedmet relies on the same arguments that it raised in its comments to the 1030 and 1071 Retests, to contend that taking samples from the outside of the brick is not appropriate for the inhomogeneous materials such as refractory bricks.[202]  CBP has responded to these arguments above.  CBP accounted for the inhomogeneous nature of the bricks by taking samples from three different areas and by grinding the samples.[203]  For the 0430 Retest, CBP took samples from the interior of the brick using a "hammer drill equipped with a hardened masonry bit."[204]  Again, CBP reiterates that the agency has the authority to select a sampling methodology in order to examine the imported merchandise.[205]

Fedmet also continues to argue that by firing the samples, CBP did not measure the samples in the condition at importation and the laboratory test itself oxidized the aluminum into

---

[199] Fedmet Comments on Draft Remand at 7-8.
[200] 0430 Retest at 3.
[201] 0430 Retest at 6.
[202] Fedmet Comments on Draft Remand at 8-9.
[203] *See supra* p. 24.
[204] 0430 Retest at 1.
[205] *See* 19 U.S.C. §1499(b).

alumina, resulting in inaccurate measurement.[206]  We responded to these arguments above and explained that CBP determined to "fire" the samples in order to achieve an accurate measurement of carbon.[207]  Fedmet, confusingly, maintains that the firing of the samples resulted in oxidization of aluminum into alumina.  As we explained above, the results in the 1030 Retest and the 1071 Retest were achieved after a multi-step analysis that included mathematical calculations, and reflect the accurate measurement of alumina in the refractory brick in the condition at the time of importation.  We explained that oxidization would actually result in higher alumina content and thus if there was any error in the test results, the results would be tilted in Fedmet's favor, i.e., the samples would show higher alumina content.  The same multi-step analysis and explanation applies to the 0430 Retest.  CBP has provided ample support (including the detailed calculations) for the final measurement of alumina in the tested samples.[208]  Fedmet fails to identify any errors in CBP's calculations.

Fedmet contends that CBP test results taken as a whole support a conclusion that Fedmet imported non-subject MAC bricks.[209]  To the contrary, the test results show that all but two brick samples tested by CBP constitute covered merchandise.[210]  Fedmet's argument is unfounded in the record and is based on a flawed interpretation of the test results.  Fedmet further argues that the information previously provided by Fedmet on the record shows that Fedmet imported non-subject MAC bricks.[211]  To support its argument, Fedmet cites thousands of pages of record material, without directly pointing to relevant pages.  CBP reviewed the record evidence Fedmet

---

[206] Fedmet Comments on Draft Remand at 10-11.
[207] *See supra* pp. 21-25.
[208] *See generally*, 1030 Retest; 1071 Retest; 0430 Retest.
[209] Fedmet Comments on Draft Remand at 12-13.
[210] *See supra* p. 16.
[211] Fedmet Comments on Draft Remand at 12-13 (citing to C.R. 91, C.R. 92, and CR. 93).

PUBLIC VERSION

cites to during the investigation, and concluded that substantial evidence on the record supported a conclusion that Fedmet falsely identified its imported merchandise on entry documentation.[212]

The exhibits that Fedmet cites[213] in its comments to the draft remand redetermination are rife with inconsistencies, and further support the conclusion that Fedmet evaded the Orders. While in the RFI responses the manufacturer provided the alleged composition of the bricks exported to Fedmet, these figures are not consistent with the results of the tests that CBP conducted.[214] Furthermore, none of the certificates of analysis from the manufacturers detail what testing methodology was used to reach those chemical compositions.[215] Additionally, invoices and purchase orders submitted as part of the RFI Response that Fedmet cites in its argument show that Fedmet itself sometimes referred to what it claims are non-subject MAC bricks as MCBs.[216] Overall, given all of the inconsistencies, Fedmet's own submissions do not support the argument that it has not engaged in evasion.

In this investigation, CBP has conducted multiple laboratory tests and for each has explained the results. CBP has also noted that where, as with certain samples in the 0430 Retest, samples contain more than 5% alumina, such bricks do not constitute covered merchandise, and thus CBP is not finding evasion with respect to such bricks. This remand outlines the test results

---

[212] *See* December 3 Determination at 5-6 (discussing Fedmet's and the Chinese manufacturer's responses to the RFIs and finding that contrary to Fedmet's contention, Fedmet had transactions involving MCBs during the period of investigation).

[213] *See, e.g.,* Fedmet Comments on Draft Remand at 3-4, 12-13.

[214] *See, e.g.*, Letter from [        company        ] to U.S. Customs and Border Protection, "[ company] Response to U.S. Customs and Border Protection for EAPA Case No. 7412," at Exhibits 4-6, pp. 88, 118, and 142 (July 24, 2020), C.R. 93 (showing higher percentage of alumina and other compounds that were not detected in the bricks analyzed by CBP).

[215] *See* Letter from [           company           ] to U.S Customs and Border Protection, "[company] Response to U.S. Customs and Border Protection for EAPA Case No. 7412," at Exhibit 2, pp. 54 and 69 (July 24, 2020), C.R. 91; [ company ] Response to U.S. Customs and Border Protection for EAPA Case No. 7412 at Exhibit 2, pp. 32, 36, 41, 46, 51, 56, 61, 66, 71, 76, 81, 86, 91, 96, 101, 106, 111, 116, 121, 126, 131, 136, 141, 146, 151, 156, 161, 166, and 171, C.R. 92; *see also* C.R. 93 at Exhibits 4-6, pages 88, 118, and 142.

[216] *See e.g*., Letter from Counsel for Fedmet Resources Corporation , Re: EAPA Case No. 7412: Fedmet Request for Information to Importer Questionnaire  Response (July 1, 2020), Exhibit 12, p. 948, C.R. 70.

**PUBLIC VERSION**

of a limited number of samples analyzed in this investigation.  The test results show that the imported bricks do not have a consistent chemical composition.  It would be extremely burdensome for CBP to conduct the type of in-depth laboratory analysis discussed in this remand for every single imported MCB.  The burden is on Fedmet to demonstrate to CBP that its entries contain MAC bricks with over 5% alumina as tested by a laboratory test that separately measures alumina, such as XRD.[217]

---

[217] *See* 19 U.S.C. § 1484 (importers of record are required to use reasonable care in making entry and providing CBP with "such other information as is necessary to enable the Customs Service to— (i) properly assess duties on the merchandise, (ii) collect accurate statistics with respect to the merchandise, and (iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.").

**PUBLIC VERSION**

## V.    CONCLUSION

In this Remand Redetermination, CBP has considered its determination of evasion in the December 3 Determination and the Admin. Review, in particular whether Fedmet's imported bricks constitute covered merchandise, and addressed the procedural issues in the original investigation.  CBP incorporates by reference the conclusions in the December 3 Determination and the Admin. Review, and continues to find that substantial evidence on the record supports a conclusion that Fedmet entered covered merchandise into the United States through evasion by importing subject MCBs and falsely declaring them as non-subject MAC bricks on entry documentation, thereby avoiding the payment of requisite cash deposits.

/s/

Victoria Cho

Acting Director – Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade
U.S. Customs & Border Protection

ALICE
A KIPEL

Digitally signed
by ALICE A KIPEL
Date: 2023.09.01
10:56:43  04'00'

/s/

Alice A. Kipel

Executive Director
Regulations and Rulings
Office of Trade
U.S. Customs and Border Protection